# STATE OF LOUISIANA
## COURT OF APPEAL
## FIRST CIRCUIT

## DOCKET NUMBER
## 2021 CA 1463

## LONESOME DEVELOPMENT, LLC

## VERSUS

## TOWN OF ABITA SPRINGS

Decision Rendered: JUN 2 9 2022

\* \* \* \* \*

ON APPEAL FROM THE
22ND JUDICIAL DISTRICT COURT
ST. TAMMANY PARISH, LOUISIANA
DOCKET NUMBER 2019-14436

HONORABLE WILLIAM H. BURRIS, JUDGE PRESIDING

\* \* \* \* \*

| | |
|---|---|
| Christopher M. Moody<br>Albert D. Giraud<br>Hammond, Louisiana | Attorneys for Defendant-Appellant<br>Town of Abita Springs |
| Paul E. Harrison<br>C. deShea Richardson<br>Mandeville, Louisiana | |
| Howard. E. Sinor Jr.<br>Phillip J. Antis Jr.<br>Alex B. Rothenberg<br>New Orleans, Louisiana | Attorneys for Plaintiff-Appellee<br>Lonesome Development, LLC |

BEFORE: McDONALD, LANIER, and WOLFE, JJ.

*E W by JMM*

*J. Wolfe dissents.*

**McDONALD, J.**

A municipality appeals a judgment finding that it breached a development agreement with a developer, ordering the municipality to comply with and specifically perform the agreement, enjoining it from interfering with the developer's performance under the agreement, and ordering it to pay the developer damages. After review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2017, Lonesome Development, LLC (Lonesome) and the Town of Abita Springs, Louisiana, began discussions regarding a planned unit development (PUD) called "Abita Meadows" on approximately 168 acres of land owned by Lonesome. A PUD is a specialized type of subdivision with unique zoning that permits greater flexibility in land use than that afforded under conventional zoning requirements. After multiple hearings before the Abita Springs Planning and Zoning Commission and before the Abita Springs Board of Aldermen, the parties executed a Development Agreement (the PUD Agreement), in January 2018, pursuant to the Louisiana Development Agreement Law (LDAL), La. R.S. 33:4780.21, *et seq.* On January 16, 2018, the Board of Aldermen unanimously approved the PUD Agreement and the attached preliminary plat of the Abita Meadows PUD.[1]

In the PUD Agreement, the parties agreed to zone the property as a PUD, ultimately to have 390 single-family residential lots, commercial and civic uses, common areas, and ponds, as depicted on the preliminary plat that was attached. Generally, the PUD Agreement provided that Abita Springs and Lonesome would share in the "obligations, burdens and benefits" of the development of the Abita Meadows PUD, and included terms regarding: zoning (density, greenspace, recreational facilities, maximum building heights, design standards); utility services; drainage; subdivision approval fees;

---

[1] A municipality may enter into a development agreement with any person having a legal or equitable interest in real property for the development of such property, as provided in La. R.S. 33:4780.21 through 33:4780.33, found in Title 33, Chapter 14, Part I, Subpart G, titled "Development Agreements." *See* La. R.S. 33:4780.22A. A municipality may, upon request of an applicant, by resolution or ordinance, establish procedures and requirements for the consideration of development agreements. *See* La. R.S. 33:4780.22B. After a public hearing on the application for a development agreement, and notice of intention to consider adoption of same, the municipality's governing authority may approve the development agreement but shall do so by passage of an ordinance. *See* La. R.S. 33:4870.28; 33:4780.29. Herein, it is undisputed that the Board of Aldermen is the governing authority for Abita Springs.

driveway permits; street dedications, servitudes, streetlights, and sidewalks; landscaping; establishment of a homeowners' association; traffic enforcement; police protection; and streets. The PUD Agreement also provided that Abita Springs would review, inspect, and approve the design and construction of all infrastructure improvements, such as sewerage, drainage, utilities, gas, water, and streets. And, in accordance with the LDAL, Abita Springs would annually review Lonesome's compliance with the PUD Agreement, after giving notice to Lonesome. Lonesome was to complete the Abita Meadows PUD in at least six phases over approximately fifteen years. As each phase of the PUD was completed, Lonesome planned to sell lots in bulk to a building contractor, who would then build and sell houses in that completed phase.

By May 2018, Abita Springs' consultants and engineers had approved Lonesome's plans for the infrastructure construction phase of the Abita Meadows PUD, and, according to Cindy Chatelain, Abita Springs' Planning and Zoning Director, all requirements had been met. On May 16, 2018, Abita Springs Mayor Greg Lemons authorized Ms. Chatelain to issue an official letter to Lonesome directing it to proceed with the infrastructure construction phase. Lonesome proceeded with the infrastructure construction by clearing the site, installing ponds and drainage, a sewer and water system, utilities, and roads.

On January 1, 2019, Daniel Curtis, having been newly elected, replaced Greg Lemons as Abita Springs mayor. Mayor Curtis was familiar with the Abita Meadows PUD as he had previously served as one of the Board of Aldermen members who voted to approve the Abita Meadows PUD, related PUD Agreement, and preliminary plat. In April 2019, about a year after construction began, Mayor Curtis and his staff held a meeting with Lonesome to discuss the Abita Meadows PUD. Mayor Curtis followed up with a letter to Lonesome, dated April 18, 2019, noting that there were issues with the supervision and testing of installed infrastructure on the project. He clarified that, going forward, Lonesome should notify his office, and Town Engineer Andre Monnot, of progressive stages of the infrastructure development, so that any necessary inspections could be scheduled. Lonesome contends that, from that point on, Lonesome complied with all inspection requirements.

By letter dated May 8, 2019, Abita Springs' attorney, Edward J. Deano Jr., notified Lonesome that Abita Springs was reviewing Lonesome's good faith compliance with the PUD Agreement.[2] The letter outlined concerns regarding inspections and capacity issues and claimed that Lonesome had violated Abita Springs' tree ordinance, Ordinance Section 9-703. Lonesome's project engineer replied by letter and responded to each of Abita Springs' concerns. On June 17, 2019, Abita Springs officials held a meeting to review Lonesome's compliance with the PUD Agreement; Lonesome was not present at this meeting. And, by letter dated July 8, 2019, Mr. Deano notified Lonesome that it had violated Abita Springs' ordinances regarding density (Ordinance Section 9-802(5)) and requiring submission of a final proposed plat within one year of the preliminary plat approval (Ordinance Section 9-806). The July 8th letter also stated:

> [Lonesome's] failure to comply with [Ordinance] 9-806 has ramifications beyond the [PUD] Agreement. **This violation nullifies the [PUD] as a matter of law.** The [Abita Springs] Council and the Planning and Zoning Commission are directed to rezone the property to its most appropriate district classification.
>
> **[T]he position of [Abita Springs] is that the PUD use previously approved for Abita Meadows is null and void.** Therefore, further work on a periodic review of the developmental agreement is moot; any further inspections, permits or any other actions of [Abita Springs] pursuant to the previously granted PUD use are unnecessary. (Emphasis added.)

In late July 2019, on Mr. Deano's advice, Mayor Curtis informed Lonesome that no more inspections would be conducted and further work on the Abita Meadows PUD was unauthorized. According to Lonesome, at that time, it had not yet completed Phase 1 of the infrastructure construction and had invested more than $6 million in the project.

In August 2019, Lonesome filed suit for breach of contract, detrimental reliance, estoppel, specific performance, injunctive relief, and damages against Abita Springs.[3] In answer, Abita Springs claimed it had performed the compliance review required by the

---

[2] Lonesome claims Abita Springs began its compliance review under La. R.S. 33:4780.23 without giving Lonesome the notice required by the PUD Agreement. According to Lonesome, the May 8th letter was the first notice it had of such review. At trial, Mayor Curtis and Mr. Deano admitted that the May 8th letter was the first written notice to Lonesome.

[3] Lonesome later added ABC Insurance Company, Abita Springs' liability insurer, as an additional defendant, but any such claims are not before us. Lonesome also added Mayor Curtis as an additional defendant and added a tortious interference claim against him. After trial on the merits, the trial court signed a judgment against Abita Springs and dismissed Lonesome's claims against Mayor Curtis with prejudice.

LDAL, considered Lonesome in violation of the density[4] and final plat submission ordinances, and considered the PUD Agreement null and void. Based on the PUD Agreement's purported nullity, Abita Springs alleged that its Town Council and Planning and Zoning Commission would "now be rezoning the property to its most appropriate district classification." After further pretrial proceedings, and the parties' unsuccessful attempts to settle their differences, the trial court set the matter for a bench trial to begin in May 2021.

On Thursday, May 13, 2021, four days before the start of trial, Abita Springs held a hearing and adopted Ordinance 519, wherein it purportedly terminated the PUD Agreement based on Lonesome's alleged lack of good faith compliance with it. Lonesome attended the hearing but contends it was not given the opportunity to present witnesses or cross examine Abita Springs' witnesses. In Ordinance 519, Abita Springs stated that Lonesome violated inspection requirements, violated Abita Springs' tree ordinance, its final plat submission ordinance, and failed to identify and obtain approval of the entity that installed gas lines in the Abita Meadows PUD. On Saturday, May 15, 2021, Abita Springs e-filed exceptions of lack of subject matter jurisdiction, no right of action, and no cause of action, claiming that the trial court no longer had jurisdiction over the lawsuit, and Lonesome could not assert claims associated with the PUD Agreement, because Abita Springs had terminated the PUD Agreement by Ordinance Number 519. In support of its exceptions, Abita Springs argued the trial court could not review that which "legally no longer exists;" any opinion by the trial court would be an "advisory opinion;" and, any judgment by the trial court would be "premature and/or moot."

The trial court heard Abita Springs' exceptions on Monday, May 17, 2021, the day trial was scheduled to begin; the trial court orally denied the exception of lack of subject matter jurisdiction and deferred the remaining exceptions to the merits. Abita Springs filed an application for emergency writ of supervisory review of the trial court's ruling and for a stay of the trial, which this court denied. *Lonesome Dev., LLC v. Town of Abita Springs,* 21-0518 (La. App. 1 Cir. 5/17/21), 2021 WL 1988077. The three-day bench trial

---

[4] On appeal, Abita Springs does not raise issues regarding the density ordinance.

5

began the following day and included testimony from multiple witnesses and the introduction of numerous exhibits.

After trial, the trial court signed a judgment on June 3, 2021, decreeing that Abita Springs had substantially breached the PUD Agreement; ordering Abita Springs to comply with and specifically perform the PUD Agreement according to its terms; enjoining Abita Springs from any action preventing, impeding, or delaying Lonesome's development of the Abita Meadows PUD in accordance with the PUD Agreement; ordering Abita Springs to pay Lonesome $4.9 million in damages, plus interest; ordering Abita Springs to pay Lonesome attorney fees and costs to be later determined; decreeing Lonesome's detrimental reliance claim moot; and, denying Abita Springs' exceptions of no right of action and no cause of action. Abita Springs appealed the adverse judgment. After this court remanded the matter, the trial court signed an amended judgment on April 5, 2022, the appellate record was supplemented with that judgment, and this court maintained the appeal.

On appeal, in multiple assignments of error, Abita Springs essentially contends Ordinance 519 validly terminated the PUD Agreement, and the trial court legally erred by retaining jurisdiction, denying Abita Springs' exceptions, and deciding the case on the merits. Alternatively, Abita Springs contends the trial court legally erred in finding Abita Springs breached the PUD Agreement and in granting Lonesome's motion to strike Abita Springs' economic loss expert's testimony.

## DISCUSSION

### The Abita Springs May 13, 2021 Hearing

In its first assignment of error, Abita Springs claims the trial court legally erred in failing to continue the trial so that the court could consider the administrative record, the testimony, and evidence presented at the May 13, 2021 hearing where the Abita Springs Board of Aldermen passed Ordinance 519. Abita Springs claims it could not have obtained a copy of the administrative record prior to trial and this evidence was material to its case. We have reviewed the transcripts from the trial court's May 17, 2021 exception hearing, as well as the trial transcripts of this case. Abita Springs did not file a written motion, nor make an oral motion, that the trial be continued. The trial court did not err

in failing to grant a continuance that was not sought. Further, if Abita Springs believed that evidence from the Board of Aldermen's May 13, 2021 hearing was material to its case, it had a duty to make it part of the record. The trial court cannot consider evidence that has not been properly and officially offered into evidence. *See Jackson v. United Svces. Auto. Ass'n Cas. Ins. Co.,* 08-333 (La. App. 5 Cir. 10/28/08), 1 So.3d 512, 515 (noting that trial court improperly reviewed and used evidence that had not been introduced as evidence). This assignment of error is without merit.

## Unilateral Termination of the PUD Agreement

In assignments of error numbers two through seven, Abita Springs' primary challenge on appeal is to the trial court's refusal to interpret the LDAL as allowing Abita Springs to unilaterally terminate the PUD Agreement and to end this litigation by the passage of Ordinance 519. Abita Springs contends the trial court failed to presume La. R.S. 33:4780.23 and Ordinance 519 were valid. As its authority for unilateral termination of the PUD Agreement, Abita Springs relies on La. R.S. 33:4780.23, which pertinently provides:

> Procedures [for the consideration of development agreements] shall include provisions requiring periodic review at least every twelve months, at which time the [developer] ... shall be required to demonstrate good faith compliance with the ... agreement. **If, as a result of such periodic review, the municipality ... finds and determines, on the basis of substantial evidence, that the [developer] ... has not complied in good faith with ... the agreement, the municipality ... may terminate or modify the agreement.** (Emphasis added.)

Although La. R.S. 33:4780.23 allows a municipality to terminate a development agreement with a developer, the statute only allows such termination if based on "substantial evidence" that the developer "has not complied in good faith" with the development agreement. The statute does not preclude a legal challenge to a municipality's termination of a development agreement. And, under La. R.S. 33:4780.26 of the LADL, "a development agreement shall be enforceable by any party thereto[.]"[5]

---

[5] Louisiana Revised Statutes 33:4780.26 provides:

> Unless amended or cancelled pursuant to [La.] R.S. 33:4780.30 or modified or suspended pursuant to [La.] R.S. 33:4780.31 or 4780.25(B), a development agreement shall be enforceable by any party thereto notwithstanding any change in any applicable general or specific plan, zoning subdivision, or building regulation adopted by the municipality or parish entering the agreement which alters or amends the rules, regulations, or policies specified in [La.] R.S. 33:4780.27.

Further, the parties' PUD Agreement is a contract, and contracts have the effect of law for the parties. *See* La. C.C. art. 1983. Although parties can mutually agree to modify or terminate a contract, one party to a contract cannot unilaterally change the terms. *See Id.; accord* La. R.S. 33:4780.30[6] (providing that the parties to a development agreement may amend or cancel it in whole or in part). *See also Cajun Constructors, Inc. v. Fleming Const. Co., Inc.,* 05-2003 (La. App. 1 Cir. 11/15/06), 951 So.2d 208, 214; *L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc.,* 99-0354 (La. App. 1 Cir. 6/23/00), 762 So.2d 1223, 1232. The PUD Agreement, Paragraph 12.1, specifically states that the agreement could be amended or canceled "but only by mutual written consent of all … parties[.]" And, under the PUD Agreement, Paragraph 14, "Remedies," the parties clearly contemplated that any disputes between them would be subject to judicial review. Under Paragraph 14.3, they designated the 22nd Judicial District Court as having jurisdiction and venue, and stated, "Any party seeking enforcement of the … Agreement shall be entitled to seek specific performance, injunctive relief, and/or monetary damages[.]"

When Abita Springs informed Lonesome in the July 8, 2019 letter that Lonesome's failure to timely submit a final plat nullified the PUD Agreement, mooted further PUD Agreement review, and canceled the need for further action by Abita Springs, Abita Springs, at that time, effectively terminated the PUD Agreement under La. R.S. 33:4780.23. In fact, Abita Springs admitted as much in its answer to Lonesome's suit when it restated its position that it had performed the review required by La. R.S. 33:4780.23, considered Lonesome in violation of the density and final plat submission ordinances, and considered the PUD Agreement null and void. Thus, Abita Springs' second attempt to terminate the PUD Agreement via Ordinance 519 was merely duplicative of its previous July 8, 2019 termination – an issue the parties had already been litigating for over a year and a half.

---

[6] Louisiana Revised Statutes 33:4780.30 provides:

> A development agreement may be amended or cancelled in whole or in part by mutual consent of the parties to the agreement or their successors in interest. Notice of intention to amend or cancel any portion of the agreement shall be given in the manner provided by [La.] R.S. 33:4780.28. An amendment to an agreement shall be subject to the provisions of [La.] R.S. 33:4780.29.

8

The starting point for interpretation of any statute is the language of the statute itself. La. R.S. 1:4. When the literal application of a statute's words leads to absurd consequences, however, we must interpret the statute in light of its purpose and in the context of the law as a whole. *Borcik v. Crosby Tugs, LLC,* 16-1372 (La. 5/3/17), 222 So.3d 672, 675. Reading La. R.S. 33:4780.23 and 33:4780.26 *in pari materia,* and in light of the PUD Agreement's terms, we conclude that, once Abita Springs took the July 8, 2019 action, Lonesome had the right to file suit to seek enforcement of the PUD Agreement and to have Abita Springs prove its right to terminate it. The very issues of whether Abita Springs has presented "substantial evidence" to prove Lonesome "has not complied in good faith" with the PUD Agreement (as required by La. R.S. 33:4780.23), and conversely, whether Lonesome has proved Abita Springs breached the PUD Agreement (as allowed by La. R.S. 33:4780.30), form the entire basis of this lawsuit. A party who asserts that an obligation is null must prove the facts giving rise to the nullity. *See* La. C.C. art. 1831. Thus, to terminate the PUD Agreement, Abita Springs was required to prove Lonesome's failure to comply with the PUD Agreement, not merely declare such by passing an ordinance. It would be absurd to interpret the LADL as allowing Abita Springs to unilaterally terminate the PUD Agreement, without having to prove Lonesome's failure to comply with it, leaving Lonesome with no recourse to challenge the termination, and to then pretend that the trial court no longer had jurisdiction to decide the issues because the PUD Agreement "legally no longer existed." Thus, we conclude that the trial court properly construed the LADL and properly denied Abita Springs' exceptions of lack of subject matter jurisdiction, no cause of action, and no right of action. For these same reasons, we likewise conclude that the trial court did not render an advisory opinion or render judgment on a moot issue. These assignments of error are meritless.

## The LDAL and the PUD Agreement

In its eighth assignment of error, Abita Springs alternatively and briefly contends the trial court erred in concluding Abita Springs breached the PUD Agreement. Abita Springs contends it was Lonesome, not Abita Springs, that breached the PUD Agreement by failing to timely submit a final proposed plat, by failing to get necessary inspections of

9

the PUD infrastructure, and by clear-cutting acres of the PUD property without approval. On the other hand, Lonesome contends the trial court correctly interpreted the LDAL and the PUD Agreement, heard substantial evidence regarding the parties' intent and performance under the PUD Agreement, and made no legal or factual errors in finding that Abita Springs breached the PUD Agreement.

We now review the trial court's legal and factual findings regarding the parties' respective obligations under the LDAL and the PUD Agreement, as well as its ultimate conclusion that Abita Springs breached the PUD Agreement. The proper interpretation of the LDAL and of the PUD Agreement are questions of law; an appellate court applies a *de novo* standard of review to statutory and contract interpretation. *Salinger Grp., Inc. v. City-Parish of East Baton Rouge,* 19-0295 (La. App. 1 Cir. 7/24/20), 309 So.3d 373, 382 (*de novo* review of statute); *Strachan v. Eichin,* 15-1431 (La. App. 1 Cir. 4/15/16), 195 So.3d 61, 64 (*de novo* review of contract). Further, where factual findings are pertinent to the interpretation of a contract, an appellate court applies a manifest error standard of review. *Strachan,* 195 So.3d at 64.

## Submission of Final Plat

The trial court determined Abita Springs breached the PUD Agreement by requiring Lonesome to submit a final plat of the Abita Meadows PUD within one year of approval of the preliminary plat, as required by a section of the Abita Springs PUD Ordinance, Ordinance Section 9-806. Based on the parties' conduct and communications during the infrastructure construction, the trial court determined that, up until Abita Springs' July 8, 2019 letter, "apparently no one ... seemed to ... care or be worried" that Lonesome had not yet filed a final plat. Ultimately, the trial court concluded that the parties had agreed that the PUD Agreement, which was the "law between the parties," and not Ordinance Section 9-806, controlled the timeline for final plat submission - particularly, an attached flow chart indicating that a final plat was due only after infrastructure construction was completed.

PUD Ordinance Section 9-806[7] provides that a PUD use shall become "null and void," where the PUD development has received preliminary plat approval, and where the final plat "has not been submitted for approval within one year after the date of approval of said preliminary plan." However, La. R.S. 33:4780.27[8] of the LDAL specifically allows the parties to a development agreement to vary from a municipality's existing land use regulations. And, the PUD Agreement, Paragraph 7.1, provides as such by stating, "Unless otherwise specified in this Agreement, the permitted use and density within the Property and such other zoning matters shall be in accordance with the PUD and the provisions of the Abita Springs Zoning Ordinance *not in conflict with this Agreement.*" (Emphasis added.) Further, the PUD Agreement, Paragraph 3.1, specifically incorporates the "Town of Abita Springs – Subdivision Development Flow Chart" (Flow Chart) as part of the PUD Agreement's terms. The Flow Chart contains no specific dates by which a developer is required to submit a final plat but indicates that final plat approval is required *after* the infrastructure construction phase. It is undisputed that Lonesome did not submit the Abita Meadows PUD final plat within one year of preliminary plat approval; it is also undisputed that Lonesome did not complete the infrastructure construction phase before Abita Springs stopped the project.

At trial, Lonesome introduced considerable evidence indicating that the parties intended the PUD Agreement's Flow Chart to govern the timing of final plat submission. Specifically, former Mayor Greg Lemons and Tim Henning, the persons who negotiated

---

[7] Ordinance Section 9-806 pertinently provides:

> A planned unit development special use shall become null and void and the subject property shall thereupon be rezoned to its most appropriate district classification, as deemed suitable by the town council acting upon the recommendation of the planning and zoning commission, in any case where said unit development has:
> . . .
>
> (2) Received preliminary plat approval and where the final plat ... or the first phase of the final plat if construction is to take place in phases, has not been submitted for approval within one year after the date of approval of said preliminary plan.

[8] Louisiana Revised Statutes 33:4780.27 pertinently provides:

> **Unless otherwise provided by the development agreement,** the rules, regulations, and official policies governing permitted uses of the land, governing density, and governing design, improvement, and construction standards and specifications applicable to development of the property subject to a development agreement shall be those rules, regulations, and official policies in force at the time of execution of the agreement. (Emphasis added.)

the PUD Agreement on behalf of the parties, testified that they intended the Flow Chart to govern. Paul Mayronne, Lonesome's attorney who drafted the PUD Agreement, testified that the parties intended the Flow Chart to control and that "we were consistently told we should follow [the Flow Chart] with regards to when the final plat would be required." He also testified that the Flow Chart provides that the final plat need not be submitted until after infrastructure construction was complete. Ms. Chatelain, the Abita Springs' Planning and Zoning Director, testified that Abita Springs had used the Flow Chart for years to direct subdivision and PUD developers "step by step [as to] how to gain approvals." She explained that specific dates were not included on the Flow Chart due to variables that affect the time frame of developments. In affidavits introduced during their testimony, former Mayor Lemons and Ms. Chatelain both attested that he/she understood that the Flow Chart would control the proper timing and sequencing of Planning and Zoning approvals for the Abita Meadows PUD; and, Ms. Chatelain attested that her office instructed Lonesome to follow the Flow Chart.

Abita Springs also introduced evidence regarding the timing requirement for Lonesome's final plat submission. Jean Thibodeaux was the civil engineer employed by Abita Springs to review and approve the Abita Meadows PUD plans and to make sure the project complied with the PUD Ordinance. Mr. Thibodeaux testified that, at a December 2017 "kick off meeting" for the Abita Meadows PUD project, he informed Lonesome that it had to follow the PUD Ordinance. He also identified two punch lists he sent to Lonesome during the infrastructure construction phase, wherein he generally referenced Ordinance 9-806.[9] Although Lonesome admits Mr. Thibodeaux's references to the PUD Ordinance, Adam Henning, Lonesome's project manager for the Abita Meadows PUD, testified at trial that, consistent with the Flow Chart, Ms. Chatelain and Mr. Thibodeaux both repeatedly told him that the final plat was to be submitted after the infrastructure was complete. Mr. Henning's testimony is corroborated by that of Geoffrey Wilson, the civil engineer who designed the Abita Meadows PUD infrastructure for Lonesome. Mr. Wilson testified that Ms. Chatelain told him to follow the Flow Chart and that, in his

---

[9] Although his punch lists referenced Ordinance Section 9-806, Mr. Thibodeaux admitted at trial that the punch lists also indicated that the final plat came "after construction" of the infrastructure.

experience designing subdivisions, it is customary to submit the final plat after completion of infrastructure. Finally, both Mr. Tim Henning and Mr. Adam Henning testified that Mr. Deano's July 8, 2019 letter was the first time that they had heard of a requirement that the final plat be submitted within one year of preliminary plat approval.

After *de novo* review, we interpret the LDAL and applicable ordinances as clearly allowing Abita Springs and Lonesome the contractual freedom to substitute the Flow Chart's non-specific timeline as controlling final plat submission over Ordinance Section 9-806's specific one-year timeline. *See Salinger Grp., Inc.*, 309 So.3d at 382; *Strachan*, 195 So.3d at 64. We agree with the trial court that the PUD Agreement's Flow Chart was the "law between the parties." *See* La. C.C. art. 1983. We also note that, as recognized in the PUD Ordinance, this conclusion conforms to the purpose of PUD zoning, which is to allow flexibility.[10] Further, based on the evidence presented, and the credibility determinations presented by that evidence, we find the trial court committed no manifest error in factually assessing the parties' intent to reach the reasonable conclusion that they always intended to follow the Flow Chart and that Ordinance Section's 9-806's "one year time period just simply did not apply to this PUD." *See La.* C.C. art. 2045 (providing that the interpretation of a contract is the determination of the common intent of the parties); *Strachan*, 195 So.3d at 64. This assignment of error is meritless.

## Inspections

The trial court also determined Abita Springs breached the PUD Agreement by claiming Lonesome's failure to obtain necessary inspections warranted termination of the PUD Agreement.

The PUD Agreement, Paragraph 6, "Review and Inspection Fees," pertinently provides:

> 6.1    The design and construction of all sewerage, water, drainage and street infrastructure improvements shall be reviewed, inspected and approved by Abita Springs's engineer based on the existing and established rules and regulations for Abita Springs. ...

---

[10] Ordinance Section 9-801(a) pertinently provides:

> *Purpose.* The purpose of [PUD] regulations is to allow mixed use and to encourage and allow more creative and imaginative design of land than is possible under district zoning regulations. ... [PUDs] are intended to allow substantial flexibility in planning and designing a proposal. This flexibility often accrues in the form of relief from compliance with conventional zoning ordinance site and design requirements.

. . .

> 6.3    All shall be designed, constructed, reviewed, inspected and approved in accordance with this agreement and the ordinances and subdivision regulations of Abita Springs.

Abita Springs had two engineers responsible for inspections of the Abita Meadows PUD project – Andre Monnot handled sewer inspections and Jean Thibodeaux handled all other inspections. Both engineers testified that they knew of no existing Abita Springs rules for inspections. Both engineers also testified, however, that Lonesome installed infrastructure at the Abita Meadows site without necessary inspections. Because of this, in April 2019, Mayor Curtis, Mr. Monnot, and mayoral staff held a meeting with Adam Henning and Mr. Wilson, at which the parties agreed on a plan for future inspections. Mayor Curtis followed up with the April 18, 2019 letter to Lonesome, clarifying that plan.

Thereafter, acceptance testing was performed on infrastructure components that Lonesome had already installed, including sewer lines, water lines, gas lines, and roadways. The Abita Springs engineers or their designees were present at these testings. Multiple testing failures occurred, but the Abita Springs engineers and Lonesome's engineer all conceded at trial that failures were part of the construction process and not unexpected. It is undisputed that, at the time Mayor Curtis stopped work on the Abita Meadows PUD, Lonesome was communicating with the Abita Springs engineers and had remedied, or was in the process of remedying, all failed infrastructure components.

The record supports a finding that Lonesome initially failed to comply with inspections requirements of the PUD Agreement. But, as noted by the trial court in oral reasons for judgment, neither town engineer knew of any applicable Abita Springs inspection rules, "ultimately all of the inspections were [passed,]" and "everything seemed to be in good order at that point." These factual findings are also reasonably supported by the record and not manifestly erroneous. *See Strachan,* 195 So.3d at 64. Thus, given the ample evidence that the parties had resolved the inspection issues, we agree with the trial court's conclusion that the inspection issue, alone or otherwise, was insufficient to warrant Abita Springs' termination of the PUD Agreement. *See Salinger Grp., Inc.,* 309 So.3d at 382; *Strachan,* 195 So.3d at 64.

## Tree Removal

The trial court determined Abita Springs breached the PUD Agreement by basing its termination, in part, on Lonesome's alleged violation of a section of the Abita Springs Tree Ordinance, Ordinance Section 9-703.[11] Although pointing to no specific provision in Ordinance Section 9-703, Abita Springs briefly claims on appeal that Lonesome did not have a permit to "clear-cut" all phases of the Abita Meadows PUD site, *i.e.,* to remove all of the trees. Conversely, Lonesome claims the need to clear-cut the site was disclosed to and approved by Abita Springs before infrastructure construction began. In oral reasons for judgment, the trial court rejected Abita Springs' position and stated that Abita Springs' reliance on the Tree Ordinance "seemed like an attempt to retroactively enforce something that had been done for months." The court noted that Ms. Chatelain had authority to approve Lonesome's removal of trees from the Abita Meadows PUD site and gave them the "go-ahead" to do so.

Generally, Ordinance 9-703 requires a permit "prior to any tree removal, residential clearing, development clearing, or timber harvesting ... within the Town of Abita Springs[.]" But, as noted earlier, La. R.S. 33:4780.27 specifically allows the parties to a development agreement to vary from a municipality's existing land use regulations. At trial, former Mayor Lemons, Ms. Chatelain, and Adam Henning all testified that the parties discussed tree removal at multiple meetings during the preliminary plat approval process, and it was understood by all involved that Lonesome would have to clear-cut the site to install the infrastructure. All three also testified that, during the preliminary plat approval process, Lonesome was never told it would need a permit to clear the site. Further, the testimony of engineers for Abita Springs and Lonesome, Messrs. Thibodeaux and Wilson, also demonstrates that the grading plan Lonesome submitted as part of the preliminary

---

[11] Ordinance Section 9-703 pertinently provides:

> Prior to any tree removal, residential clearing, development clearing, or timber harvesting, as defined herein, within the Town of Abita Springs, a tree removal, residential clearing, development clearing or timber harvesting permit shall be obtained for these respective activities.

Specific tree removal requirements are detailed in Ordinance Section 9-705 (removal of specifically protected trees); Ordinance Section 9-706 (tree removal on previously developed sites); Ordinance Section 9-707 (issuance of residential clearing or development clearing permits); and, Ordinance Section 9-708 (procedure for tree removal, residential clearing and development clearing permits).

plat approval, and which plan was approved by Mr. Thibodeaux, indicated that all trees would be removed. According to former Mayor Lemons and Ms. Chatelain, by May 2018, when former Mayor Lemons instructed Ms. Chatelain to issue a letter to proceed, Lonesome had submitted *all documentation required* to start the infrastructure construction phase. Mr. Tim Henning and Mr. Adam Henning both testified that Abita Springs' May 8, 2019 letter was the first notice Lonesome received that a separate tree removal permit was required.

After *de novo* review, we interpret the LDAL, ordinances, and PUD Agreement as allowing Abita Springs and Lonesome the contractual freedom to substitute Lonesome's approved grading plan (which showed that the infrastructure construction of the Abita Meadows PUD would be clear-cut) for Ordinance 9-703's tree removal permit requirement. Although the PUD Agreement does not expressly dispense with a tree permit requirement, the parties' conduct in negotiating, approving, and executing the PUD Agreement clearly shows such an intent.[12] *See* La. C.C. arts. 1983 and 2045. The record evidence factually demonstrates that Ms. Chatelain, Mr. Thibodeaux, the Planning and Zoning Commission, and the Board of Aldermen approved the grading plan during the preliminary plat approval process and no further documentation by Lonesome would be required. We agree with the trial court's observation that Abita Springs' reliance on Ordinance 9-703 in May 2019 "seemed like an attempt to retroactively enforce something that had been done for months." *See Salinger Grp., Inc.,* 309 So.3d at 382; *Strachan,* 195 So.3d at 64.

### Ruling Granting Motion to Strike Expert Witness

In its last assignment of error, Abita Springs contends the trial court erred in granting Lonesome's motion to strike Abita Springs' economic loss expert witness and in denying its motion for new trial on the same issue. In opposition, Lonesome contends that Abita Springs' failure to proffer its expert's testimony precludes this court's review of the trial court's ruling.

---

[12] The only specific provision in the PUD Agreement addressing trees is Paragraph 1.2.5, which states, "The tree removal/clearing fees of Abita Springs shall not apply to the PUD or the Property." According to Mr. Mayronne, the PUD Agreement drafter, the intent of this provision was "[that] the tree removal permit and/or any fees related to that would not be applicable to the PUD or the property."

16

A trial court's evidentiary rulings are reviewable on appeal subject to the provisions of La. C.C.P. art. 1636. However, the evidence excluded by the trial court below must be available for appellate review. *Haney v. Lewis*, 15-1173 (La. App. 1 Cir. 6/3/16), 2016 WL 3127254, *7. Without a proffer, appellate courts have no way to ascertain the nature of the excluded testimony. *Id.* Error may not be predicated upon a ruling that excludes evidence unless a substantial right of a party is affected and the substance of the evidence was made known to the court by counsel. *See* La. C.E. art. 103A(2). In those instances, it is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend that the exclusion of such evidence was erroneous. *Haney*, 2016 WL 3127254, at *7.

In this case, Abita Springs did not proffer the substance of its expert witness's testimony. Thus, it cannot now contend that the trial court's exclusion of such evidence was error. Accordingly, the trial court's ruling on the motion to strike was not properly preserved for appeal and this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, after a thorough review of the record, we find the trial court committed no legal or factual error in this case. We affirm the trial court's June 3, 2021 judgment. We assess appeal costs of $6,066.20 to the Town of Abita Springs, Louisiana.

**AFFIRMED.**